<u>**NOT FOR PUBLICATION**</u>

**FILED**

JAMES J. WALDRON, CLERK

**AUGUST 17, 2009**

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY:  s/ Ronnie Plasner,  DEPUTY

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |
|---|
| **In Re:** <br> **MANYFOODS, INC.,** <br><br> Debtor. |
| **MANYFOODS, INC.,** <br><br> Plaintiff, <br><br> v. <br><br> **INTERSTATE REALTY CO., LLC,** <br> **WAL-MART STORES, INC. and WAL-** <br> **MART REAL ESTATE BUSINESS** <br> **TRUST,** <br><br> Defendants. |

Case No.:   03-27989 (DHS)

Adv. No.:   05-01843 (DHS)

Judge: Donald H. Steckroth, U.S.B.J.

**OPINION**

**APPEARANCES:**

Jaffe & Asher LLP
Gregory E. Galterio, Esq.
Glenn P. Berger, Esq.
600 Third Avenue, Ninth Floor
New York, New York 10016
***Counsel to Plaintiff/Debtor Manyfoods, Inc.***


Lasser Hochman, L.L.C.
John R. Wenzke, Esq.
75 Eisenhower Parkway
Roseland, New Jersey 07068
***Counsel to Defendant Interstate Realty Co., LLC***


McGuireWoods LLP
Loree J. Shelko, Esq.
1345 Avenue of the Americas
Seventh Floor
New York, New York 10105-0106
***Counsel to Defendant Wal-Mart Stores, Inc. and Wal-Mart
Real Estate Business Trust***


McGuireWoods LLP
Donald A. Rea, Esq.
Sung B. ("Ben") Yhim, Esq.
7 Saint Paul Street
10th Floor
Baltimore, Maryland 21201
***Counsel to Defendant Wal-Mart Stores, Inc. and Wal-Mart
Real Estate Business Trust***

2

**THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE**

Before the Court are separate applications for summary judgment filed by Defendants Interstate Realty Co, LLC ("Interstate") and Wal-Mart Stores, Inc. ("WMS") and Wal-Mart Real Estate Business Trust ("WMREBT") (hereinafter the Wal-Mart entities will collectively be referred to as "Wal-Mart" and the three entities will be collectively referred to as "Defendants") against Manyfoods, Inc. ("Manyfoods" or "Debtor").  Manyfoods separately opposed both motions.

Having heard the arguments of counsel and for the reasons stated hereafter, Interstate's motion for summary judgment and Wal-Mart's motion for summary judgment are each hereby granted. The Court has jurisdiction over this motion pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper under 28 U.S.C. §§ 1408 and 1409.  The following shall constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## Statement of Facts and Procedural History

### I.    Background

On May 25, 1973, Cole Enterprises leased a portion of the Cedar Knolls Shopping Center ("Shopping Center") in Hanover, New Jersey to Stop & Shop Companies, Inc. ("Stop & Shop") ("Lease").  *Cert. of John R. Wenzke, Esq. in Supp. of Interstate Realty Co., LLC's Mot. for Summ. Judg. ("Wenzke Cert."),* Ex. A; *Mem. of Law in Supp. of Defs. Wal-Mart Stores, Inc. and Wal-Mart Real Estate Bus. Trust's Mot. for Summ. Judg. ("Wal-Mart's Mot."),* Ex. A.  Cole Enterprises, as landlord, is the predecessor-in-interest to Interstate.  *Id.*  On November 10, 1978, Stop & Shop

entered into a sublease ("Sublease") with Michas Brothers & Sons, Inc., which operated a Super

Foodtown in the Shopping Center. *Wenzke Cert.*, Ex. B; *Wal-Mart's Mot.*, Ex. B.  In March 2002,

Michas Brothers assigned its interest in the Super Foodtown to Manyfoods.  *Wal-Mart's Mot.*, Ex.

C.

The lease between Interstate and Stop & Shop contains the following covenant, located at

Section 10.2(a), which is the basis of the issue between the parties here:

> During such time as Tenant [Stop & Shop] or anyone claiming under
> Tenant shall occupy the demised premises, Landlord [Interstate] shall
> not lease, use or permit to be used any other portion of or premises in
> the Shopping Center for (i) a "Supermarket" (defined below); (ii) a
> retail store as to which the dollar sales of milk and other dairy
> products comprise seventy-five percent (75%) or more of total
> monthly dollar sales; or (iii) a convenience or compact type grocery
> store, so-called.  The term "Supermarket" as used in this lease shall
> mean a store of the type now commonly operated by Tenant named
> herein, Star Market, Great Atlantic & Pacific Tea Company, First
> National Stores and similar chains, selling at retail a wide variety of
> foods for off-premises consumption; without limiting the foregoing,
> the sale of food for off-premises consumption where such sale is
> incidental to the principal purposes of a store (such as the incidental
> sale of packaged food by a drug store) shall not cause the store
> making the sale to be classified as a "Supermarket" within the
> meaning of the foregoing definition, nor shall a store selling only a
> limited number of items of food for off-premises consumption (such
> as an ice cream store or bakery), or whose sales are principally
> beverages, be deemed a Supermarket".

*Wenzke Cert.,* Ex. A at § 10.2(a); *Wal-Mart Mot.,* Ex. A at § 10.2(a).  The language of the Lease

provides that any breach by the Landlord entitled it to written notice from Stop & Shop. *Wenzke*

*Cert.*, Ex. A § 20.10; *Wal-Mart Mot.*, Ex. A at §20.10.  Furthermore, Section 5.1 of the Sublease

provided that Manyfoods should notify Stop & Shop if there is a lack of performance of a Lease

obligation by the Landlord.  *Id.,* Ex. B. at § 5.1.  Thereafter, Stop & Shop would notify the Landlord.

4

*Id.* The language in the Sublease clearly indicates that after the above procedure is enacted, if the default remains uncured, Manyfoods could then sue the Landlord in the name of Stop & Shop. *Id.*

On November 15, 2001, Wal-Mart entered into a lease with Interstate for 102,357 square feet of the Shopping Center ("Wal-Mart Lease"). *Wenzke Cert.*, Ex. C.; *Wal-Mart Mot.*, Ex.D. Wal-Mart describes itself as a discount retailer selling a variety of products including clothing, toys, electronics, jewelry, books, office supplies, furniture, photo processing, and tools. *Wal-Mart Mot.,* at 4. Included in the Wal-Mart Lease at Section 5 was a provision that Wal-Mart would be subject only to the lease restrictions set forth in the existing shopping center leases annexed as Exhibit F to the Wal-Mart Lease. *Wenzke Cert.*, Ex. C.; *Wal-Mart Mot.*, Ex. D. Wal-Mart opened its store on January 22, 2003. *Wal-Mart. Mot.*, Ex. E.

## II.     Events Leading to Bankruptcy Filing

In March 2002, William Louttit purchased a controlling interest in Manyfoods from Michas Brothers. *Wal-Mart Mot.*, Ex. C. At the time of purchase, Louttit had knowledge of the poor financial condition of the Cedar Knolls Super Foodtown. However, at his deposition, he stated that the condition was worse than he thought. *Id.* Manyfoods incurred over $1 million in operating losses during fiscal year 2001 and over $2 million for fiscal year 2002. *Id.* Furthermore, a Bradlees store that had operated in the Wal-Mart space closed a few months prior to Louttit's acquisition. *Id.* Louttit testified that after Bradlees closed, "the supermarket in Cedar Knolls lost about $40,000 a week in sales, and that severely affected the company." *Id.* In addition, Louttit stated that the physical condition of the Super Foodtown was "abominable." *Id.*

In October 2002, Manyfoods acquired two other supermarkets from Fairview Partners, LLC, located in Wanaque and River Vale, New Jersey. *Id.; Wenzke Cert.*, Ex. D. Manyfoods assumed approximately $4 million of Fairview's debt . *Id.* Manyfoods' Financial Report for the year ending December 28, 2002 ("2002 Financial Report"), prepared by Marc Memoli, CPA, indicated:

> On October 19, 2002, the company purchased two locations from an entity that was in default in its notes payable to a bank. Upon completion of the purchase transaction, the Company assumed the total debt of the defaulted entity, which affected its ongoing operations. The Company is not in compliance with the restrictive financial covenants of the loan. The Company's current year loss, and the Company's total liabilities exceed total assets and the uncertainty of the bank's commitment as to the permanent financing of the Company raise doubt about the Company's ability to continue as a going concern.

*Wenzke Cert.*, Ex. D; *Wal-Mart. Mot.*, Ex. L. At the end of 2002, Manyfoods had only $100,667. in cash, a $1 million decrease from early 2002 and Manyfoods had accrued rental arrearages of $375,300. *Id.*; *Wal-Mart Mot.,* Ex. C.

At the time of its bankruptcy filing, Manyfoods faced sixteen (16) separate lawsuits from creditors. Finally, GS Distribution Company filed an *ex parte* motion in the United States District Court  for the District of New Jersey seeking a preliminary injunction to freeze the Debtor's accounts under the Perishable Agricultural Commodities Act. *Wal-Mart Mot.,* Ex. C; *Wenzke Cert.,* Ex. E. Manyfoods filed for Chapter 11 bankruptcy protection on May 29, 2003, when its efforts to negotiate the release of its frozen assets proved unsuccessful. *Id.*

## III.    Post-Petition Events

At the time of the bankruptcy filing, the Debtor operated three stores: River Vale, Wanaque, and Cedar Knolls. *Wal-Mart Mot.*, Ex. N. River Vale's sublease was surrendered and its assets sold

at public auction.  The Debtor received in excess of $750,000 in consideration. *Id.* The Wanaque

store's fixtures and pharmacy department were sold as was a liquor store in Cedar Knolls. *Id.*

A year later, the Debtor filed a motion to sell the Cedar Knolls Super Foodtown as a going

concern.  *Id.*  In its application to sell, Manyfoods attached an Asset Purchase Agreement with Food

King, Inc., which owns and operates another Foodtown.  *Id.* at Ex. G. In conjunction with the

proposed sale, the Debtor would also assign the Lease with Stop & Shop to the proposed purchaser.

*Id.* Louttit contacted thirteen (13) supermarket proprietors, which resulted in a firm offer of

$850,000.00 plus Net Acquisition Cost of the inventory and an offer from Oliva Supermarkets,

L.L.C. ("Oliva") for $825,000.00.   *Id.* Interstate asserts that Manyfoods did not approach it

concerning purchase of the sublease. *Interstate Mot.*, 10.  Moreover, Interstate contends that the

Debtor's DIP Lender, White Rose Division of Di Giorgio Corporation ("White Rose") controlled

the sale process essentially focusing upon Foodtown operators in order for White Rose to maintain

its vendor position. *Id.*; *Wenzke Cert.*, Ex. G.  After an auction, Oliva provided the highest and best

offer and the Court approved the sale on January 26, 2004.  *Interstate Mot.*, 10; *Cedar Knolls

Supermarket Sale Approval Order,* 03-27989 (DHS) (Dkt. No. 369), Jan. 26, 2004 ("Sale Order").

 In conjunction with the sale approval, the Stop & Shop Lease was assigned to Oliva by the Debtor.

*Id.*  On May 16, 2005, Manyfoods commenced the  adversary proceeding against Interstate and Wal-

Mart arguing that Wal-Mart was in violation of Stop & Shop's rights under the restrictive covenant

in the Stop & Shop Lease. *Wenzke Cert.*, Ex. I.

## Legal Arguments

### I.    Interstate's Position

The Landlord argues that Manyfoods' financial situation was "dire" prior to the opening of the Wal-Mart store, particularly as reflected in the 2002 Financial Statement. *Interstate Mot.*, 11. In addition, Manyfoods acknowledged that it was forced into bankruptcy due to the *ex parte* seizure of its bank accounts by GS Distribution Company. *Id.*

Interstate takes issue with the lack of notice provided by Manyfoods with respect to the sale of Manyfoods assets, including the Sublease. *Id.* at 12. Stop & Shop was included on the service list as the landlord and Stop & Shop failed to notify Interstate. Interstate further contends that it was never offered the opportunity to purchase the Sublease when Manyfoods decided to pursue an asset sale. *Id.* at 10.

Interstate also points to the August 2003 action commenced in this Court by Manyfoods against Interstate where Manyfoods sought to prevent the termination of the Sublease. *Id.* at 12. During that action, Manyfoods *never* raised the contention that its bankruptcy filing was precipitated by the opening of the Wal-Mart store. *Id.* (emphasis added) That adversary proceeding was resolved and the Court entered an Order on August 21, 2003 whereby Manyfoods agreed to dismiss all claims against Interstate with prejudice. *Id.*; *Wenzke Cert.*, Ex. I.

In defending against Manyfoods' contention that the Wal-Mart store opening caused a decline in sales and the eventual bankruptcy, Interstate puts forth three assertions. First, Manyfoods' position that a breach of the restrictive covenant occurred is untenable due to a lack of privity of contract or privity of estate between Manyfoods and Interstate. *Interstate Mot.,* 15-16. The Sublease

8

entered into by Manyfoods and Stop & Shop makes no mention of Interstate being a party to that agreement. *Id.* at 16. Furthermore, Manyfoods was not a party to the Interstate and Stop & Shop Lease. *Id.* Interstate also points out that when the sale and assignment to Oliva took place, it was not notified since Interstate had no role in the Sublease. *Id.* Interstate further maintains that Manyfoods was not capable of enforcing its rights against Interstate pursuant to the terms of the Sublease and Lease. Interstate argues that the foregoing is evidence of the lack of privity with Manyfoods. *Id.* at 17. Additionally, Interstate contends that the language of the Lease and Sublease required written notice of a breach caused by Interstate, which was never provided, leaving Interstate with no opportunity to investigate and cure the alleged breach. *Id.* at 18-19. Finally, Stop & Shop did not suffer any damage here, and thus, Manyfoods cannot demonstrate a breach of contract claim. *Id.* at 20.

Second, Manyfoods cannot assert a tortious interference claim since the contractual relationship at issue here was between Interstate and Stop & Shop. Manyfoods cannot put forth evidence of malice or intentional interference by Interstate. *Id.* at 21. On the contrary, Interstate protected itself by including a provision in the Wal-Mart Lease requiring Wal-Mart to abide by restrictive covenants included in other leases in the Shopping Center. *Id.*

Third, Interstate cannot have been unjustly enriched by requiring Wal-Mart to comply with the Stop & Shop restrictive covenant. *Id.* at 22. Manyfoods cannot demonstrate that Interstate received and retained an economic benefit. *Id.*

In its reply, Interstate argues that Manyfoods appears to have conceded that there is no privity since it raises the argument that the Sublease was in fact an assignment allowing Manyfoods

to maintain its claims against Interstate. *Interstate Realty Co., LLC's Reply Mem. of Law in Supp. of Its Mot. for Summ. Judg. ("Interstate Reply")*, 3.   In addition, Manyfoods is judicially estopped from making this argument in as much as, during the sale process, Manyfoods asserted the fact that a sublease was being purchased by Oliva.   *Id.* at 4.   The posture of the sale would have been different had the agreement been an assignment as opposed to a sublease with Interstate having the right of notification and the opportunity to challenge the assignment.   *Id.* at 6.   The tortious interference and unjust enrichment claims cannot stand because Manyfoods has failed to rebut the position that Interstate protected Stop & Shop by making Wal-Mart subject to the restrictive covenants in the Shopping Center leases. *Id.* at 32.

## II.    Wal-Mart's Position

First and foremost, Wal-Mart argues that its store is not a supermarket, but rather a discount retailer with a limited sale of food. *Wal-Mart Mot.*, 10-17.   Wal-Mart also contends that Manyfoods cannot enforce the restrictive covenant here due to the lack of privity of contract.   *Id.* at 17.   Without being able to enforce breach of contract claims against Interstate, Manyfoods' tortious interference claims against Wal-Mart cannot stand.    *Id.* at 18. Morever, Manyfoods cannot sustain a tortious interference claim against Wal-Mart as there was no malice on Wal-Mart's part by opening the store for purely profit purposes. *Id.* at 20-21. Wal-Mart maintains that it did not aid or abet Interstate's alleged breach of contract nor did it unfairly compete with Manyfoods. *Id.* at 22-23.   Lastly, Manyfood's alleged damages were not directly or proximately caused by Wal-Mart as Manyfoods had serious signs of insolvency prior to the opening of the Wal-Mart store.   *Id.* at 26.

III.    **Manyfoods' Position**

A.      **In Opposition to Interstate Realty**

Manyfoods contends that it has standing to sue Interstate because the agreement with Stop & Shop was an assignment, not a sublease. *Mem. Of Law of Pl. Manyfoods, Inc. in Opp. to Mot. of Def. Interstate Realty, Co., LLC for Summ. Judg. ("Manyfoods-Interstate Opp.")*, 7-8. Manyfoods also argues that it was an intended third-party beneficiary of the insertion of the restrictive covenant in the Wal-Mart Lease. *Id.* at 10. In addition, Manyfoods maintains that the failure to provide notice is not a bar to recovery because both the Lease and Sublease have a "no waiver" clause. *Id.* at 14. Furthermore, Manyfoods interprets the Sublease to clearly allow Manyfoods to assert damages against Interstate for violation of the restrictive covenant. *Id.* at 19-20.

As to the tortious interference claim, Manyfoods submits that Interstate's inaction resulted in the violation of the restrictive covenant and resulted in Manyfoods' damages. *Id.* at 20-21. Manyfoods also argues that Interstate was unjustly enriched by retaining the full rent once the violation of the restrictive covenant began. *Id.* at 25. Lastly, it is argued Interstate received a benefit from Manyfoods' serving an anchor role in the Shopping Center. *Id.*

B.      **In Opposition to Wal-Mart**

Manyfoods believes that its assets were sold for far less than they should have been due to the opening of the Wal-Mart store in the Shopping Center. *Mem. of Law of Pl. Manyfoods, Inc. in Opp. To Mot. of Defs. Wal-Mart Stores, Inc. and Wal-Mart Real Estate Business Trust for Summ. Judg. ("Manyfoods-Wal-Mart Opp.")*, 1, 14. Manyfoods argues that Wal-Mart does not have to be classified as a supermarket to be in violation of the restrictive covenant. *Id.* at 9. The fact that

11

it sold supermarket goods at a large volume serves as a breach. *Id.* As to its standing, Manyfoods states that the Sublease language is clear in providing Manyfoods with the right to enforce the restrictive covenant. *Id.* at 16.

## Discussion

### I.    Summary Judgment Standard

A court may grant summary judgment under Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* At the summary judgment stage, the role of the court "is not to weigh evidence, but to determine whether there is a genuine issue for trial." *Knauss v. Dwek*, 289 F. Supp. 2d 546, 549 (D.N.J. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The court must construe facts and inferences in a light most favorable to the non-moving party. *See Am. Marine Rail NJ, LLC v. City of Bayonne*, 289 F. Supp. 2d 569, 578 (D.N.J. 2003) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)). "Only evidence admissible at trial may be used to test a summary judgment motion. Thus, evidence whose foundation is deficient must be excluded from consideration." *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 471 (3d Cir. 1989) (citations omitted).

The moving party must make an initial showing that there is no genuine issue of material fact. *See Knauss*, 289 F. Supp. 2d at 549 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then shifts to the non-moving party to "'make a showing sufficient to establish the

existence of [every] element essential to the party's case, and on which that party will bear the burden of proof at trial.'" *Cardenas v. Massey*, 269 F.3d 251, 254-55 (3d Cir. 2001) (questioned on other grounds) (quoting *Celotex Corp.*, 477 U.S. at 322).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original).  An issue of fact is "genuine" if a reasonable juror could return a verdict for the non-moving party. *See id.* at 248.  Furthermore, a material fact is determined by the substantive law at issue. *See Crane v. Yurick*, 287 F. Supp. 2d 553, 556 (D.N.J. 2003) (citing *Anderson*, 477 U.S. at 248).  A fact is "material" if it might affect the outcome of the suit under governing law. *Id.*  Disputes over irrelevant or unnecessary facts are insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 248 (citation omitted).

However, even if material facts remain disputed, summary judgment may be proper if, after all inferences are drawn in the non-moving party's favor, the moving party is entitled to judgment as a matter of law. *Id.* at 248-50.  Such a judgment is appropriate "as a matter of law" when the non-moving party has failed to make an adequate showing on an essential element of his or her case, as to which he or she has the burden of proof. *See Celotex Corp.*, 477 U.S. at 322-23.  When one party moves the court for summary judgment, Federal Rules of Civil Procedure 54(c) and 56, taken together, permit the court to enter summary judgment on behalf of the non-movant, even if the non-movant has not filed a cross-motion for summary judgment. *See Peiffer v. Lebanon Sch. Dist.*, 673 F. Supp. 147, 151-52 (M.D. Pa. 1987) (citation omitted).  On the other hand, a court must deny

a motion for summary judgment when a genuine issue of material fact remains to be tried, or where the moving party is not entitled to a judgment as a matter of law.

## II.     Is Wal-Mart a Supermarket?

The parties have agreed that a dispositive issue in this case is whether Wal-Mart may be characterized as a supermarket. This determination is directly related to whether the restrictive covenant is implicated. The following expert reports from the three parties are considered: (a) analysis of CMC Group, expert for Manyfoods; (b) opinion of William C. Davidson, expert for Interstate; (c) reports of J. William Crowe and Donald L. Frankenfeld, experts for Wal-Mart. *See Cert. of Glenn P. Berger in Opp. to Wal-Mart Mot.*, Ex. N.; *Cert. of Glenn P. Berger in Opp. to Interstate Mot.*, Ex. K.[1]; *Wenzke Cert.*, Ex. N.; *Wal-Mart Mot.,* Ex. F..

### A.     Expert Analysis

#### 1.     Analysis of CMC Group, Expert for Manyfoods

CMC Group summarily opines that Wal-Mart carried supermarket-type products such as grocery, dairy, frozen, snack items and beverages and this was not incidental use. *See Berger Cert.*, Ex. K, 1. CMC Group focuses upon the distinction between primary and incidental use stating that primary use is characterized by carrying of products for a limited time not warranting advertising or special infrastructure for display. *Id.* at 1-2, 3. CMC Group states that Wal-Mart sells the most well-known brands of food items and a variety in excess of incidental use. *Id.* at 2. CMC Group counted six aisles of grocery store items located at the front of the sales floor. *Id.* at 3. CMC Group

---

[1] CMC Group's analysis is located at Exhibit N and Exhibit K of the Berger Certification of Manyfoods Opposition to the Wal-Mart and Interstate Motions, respectively. Hereinafter, the Court will refer to this report as *Berger Cert.,* Ex. K.

submits that Manyfoods sold approximately $2.3 million less than it would have if not for Wal-Mart. *Id.* at 1.

CMC provides statistical data for the position that Wal-Mart caused the decline in Manyfoods' sales. Specifically, Manyfoods' sales decreased by 24.1% from February to December 2003, after the opening of Wal-Mart in February 2003. *Id.* at 4. This decrease was in all departments, not just in the grocery department, and arguably can only be attributed to Wal-Mart's opening. *Id.* CMC Group determined that the gross margin lost to Manyfoods was approximately $19,100 weekly or $991,700 annualized. *Id.* at 5-6. After accounting for incremental savings on variable costs, the net income loss was calculated to be $644,600. *Id.* at 6. The after-tax loss, at the New Jersey statutory rate of 39.6%, was $389,300. *Id.* The annualized net cash flow loss was $235,900 after considering the reduced required inventory. *Id.* The CMC Group then calculated Net Present Value by dividing the final year cash flow by the cost of capital, yielding a loss of $2,284,900, which they submitted represented the additional amount Manyfoods would have been worth. *Id.*

### 2. Opinion of William C. Davidson, Expert for Interstate

Davidson was retained to express an opinion as to whether Wal-Mart's operations violated the restrictive covenant in the lease and whether these operations negatively impacted Manyfoods' sales. *See Wenzke Cert.*, Ex. N, 1. Davidson's expertise is based upon approximately 30 years in the industry as principal shareholder and chief executive officer of a supermarket chain in central New Jersey. *Id.* Summarily, Davidson submits that the presence of "supermarket items" does not

meet the lease's definition of a supermarket and compares it to the "incidental sale of packaged food by a drug store" as also defined in the lease. *Id.* at 2.

Davidson opines that Wal-Mart is not a supermarket under the lease nor was reasonably defined as such at the time the lease was entered into because: (1) Wal-Mart does not have fresh meat, produce, deli or bakery departments;[2] (2) the variety of products sold at Wal-Mart is limited in comparison to a supermarket; and (3) the percentage of sales and floor space devoted to sale of food is "incidental." *Id.* at 2-3. Much of Davidson's opinion is based upon a comparison of Wal-Mart and a drug store that is the example used in the lease definition. He points out that Wal-Mart food sale is much like that of a drug store including a limited variety of products in its advertising. *Id.* at 3-4. Davidson contends that display cases, shelving or refrigerated cases are not indicative in showing that the food sales are more than incidental. *Id.* at 4. The location of the food products and distribution sources and methods are inconsequential in this opinion. Specifically, he states that perishable food items logically are placed towards the front of the store closer to the registers so that they can be picked up last.

Davidson notes that a salient fact is that Stop & Shop previously elected to locate a Bradlees discount store in the shopping center. Bradlees is a discount store like Wal-Mart. Davidson states "a discount store is a natural complement to the shopping center and the other stores located within it." *Id.* at 6. Discount centers typically generate sales volume for the other stores in the center including the supermarket. Davidson submits that historically, "Pathmark built in centers with K-

---

[2] Davidson clearly states that the Hanover Wal-Mart was not a Wal-Mart Supercenter which are larger Wal-Mart stores that expressly operate supermarkets. Wal-Mart Supercenters began in 1988 "featuring a complete grocery in addition to general merchandise." *http://walmartstores.com/AboutUs/* (last visited July 2009). The Hanover Wal-Mart opened in 2003.

Mart through their market area.  Stop & Shop built in centers with Bradlees, a discount store chain that they owned and operated for many years."  *Id.*  Davidson believes that the Wal-Mart store should have generated sales for Manyfoods, rather than cause a decline. *Id.*

Davidson opines that Manyfoods was underperforming as indicated on its 2002 financial statement.  He believes this may be attributed to the area being "over-stored" with the opening of an Edwards Super Food in 1999, the remodeling of an Acme in 2000, the opening of a Super Stop & Shop in late 2000, and the opening of a Pathmark in 2002.  *Id.* at 8.  Manyfoods' 2002 financial statements were dated nearly two months before the opening of Wal-Mart. *Id.*  Manyfoods' decline in sales was in all departments, not just on products that Wal-Mart also carried, which is another indication that the decline was caused by the numerous stores and not Wal-Mart.  *Id.* at 9.

### 3.     Expert Reports on behalf of Wal-Mart

#### a.     J. Walter Crowe

In order to prove that the restrictive covenant was not violated, Crowe states that Wal-Mart must demonstrate that it is not a Supermarket as defined in the lease, that it is not a retail store with dollar sales of milk and other dairy products of seventy-five percent (75%) or more of total dollar sales, and that it is not a convenience or drug store.  *Wal-Mart Mot.*, Ex. F, 1.  The Food Marketing Institute defines supermarket as "a format offering a full line of groceries, meat, and produce, which offers a service deli and frequently a service bakery," with average store size in 2006 of 48,750 square feet, weekly sales of $327,823, and an average of 45,000 items for sale. *Id.* Manyfoods falls squarely within this definition in 2003 with weekly average sales of $328,900 and 34,800 square footage. *Id.*  Wal-Mart, on the other hand, does not provide groceries, meat, produce, service deli

and bakery.  At Wal-Mart, only 3.39% of the floor space or 2.78% of square footage was devoted to food sales. *Id.* at 3.

Crowe further points out the Lease states that the restriction is from offering a "full line of groceries," thus, Wal-Mart's strategy is to offer the fastest moving items. *Id.* at 4.  The expert states: "The consumer does not have the same food offering expectations of Wal-Mart because he or she does not view Wal-Mart as a supermarket." *Id.* Crowe submits that consumers choose their venue for shopping based upon the overall purpose for the shopping trip. *Id.* at 5. The examples provided are: (1) at back-to-school shopping time, a consumer is likely to pick a general merchandiser or office supply store and (2) when compiling a grocery list, a consumer will likely go to a supermarket. *Id.* In conclusion, Crowe determines that Wal-Mart was compliant with the lease restriction due to the limited offering and space allocation for food products. *Id.* at 6.  In providing a financial analysis, Crowe points out departures in gross margins from the industry averages for grocery (food and non-food consisting of *inter alia* paper goods, detergents, and pet foods, which are not examples of "food for off-premises consumption), meat, dairy and frozen.

### b.      Donald L. Frankenfeld

Frankenfeld was retained to answer the following: (a) From January 2003 until the Petition Date, was Wal-Mart's sale of food for off-premises consumption incidental to its primary business?; (b) Did this sale of food for off-premises consumption have a material adverse economic effect on Manyfoods?; and (c) Are there flaws in the methodologies used by Manyfoods' experts? Frankenfeld respectively answered yes, no, and yes. *Wal-Mart Mot.*, Ex. H., 2.

18

To determine from an economic standpoint whether Wal-Mart's food sales for off-premises consumption is significant, Frankenfeld analyzed the space allocation and sales by revenue. *Id.* With respect to space allocation, Frankenfeld determined that the entire store space was 104,959 square feet of which ten percent (10%) was utilized for non-retail purposes such as offices and inventory storage. *Id*. Of the retail space, 2,854 square feet was devoted to groceries, which is less then 3.5% of retail space and less than 3% of total space. *Id.* Frankenfeld opines that this is a non-material allocation of space, which in addition to low-margin sales, can be regarded as incidental. *Id.* As for sales by revenue, groceries accounted for less than 9% of total sales both before and after the Petition Date. *Id.* at 3.

**B.    Legal Analysis**

In addition to the expert opinions, the Court will also consider the legal arguments regarding the definition of a supermarket. Supermarket is defined as "a self-service retail market selling foods and household merchandise."  THE MERRIAM-WEBSTER DICTIONARY 687 (3d ed. 1974). Since then, supermarket's definition has been expanded to include: "something resembling a supermarket especially in the variety or volume of its goods or services." MERRIAM-WEBSTER ONLINE, www.http://www.merriam-webster.com/dictionary/supermarket, (last visited July 2009). *See In re Envirodyne Indus.*, 29 F.3d 301, 305 (7th Cir. 1994) ("[D]ictionaries. . . created by strangers to the dispute. . . do not present a similar danger of manufactured doubts and are therefore entirely appropriate for use in contract cases as interpretive aids. Appropriate, and sometimes indispensable.  It would be passing odd to forbid people to look up words in dictionaries. . . ."). The

expanded definition of supermarket clearly focuses upon variety or volume – issues that are in contention in the instant matter.

In *Piggly Wiggly of Mansfield, Inc. v. Wolpert Associates*, the lease entered into by Wal-Mart Stores included a restriction on operating as a supermarket while Piggly Wiggly contracted for the exclusive right to operate as a supermarket. *See Piggly Wiggly of Mansfield, Inc. v. Wolpert Assocs.*, 519 So. 2d 371, 372 (La. Ct. App., 2d Cir. 1988). The Piggly Wiggly and the lessor stipulated "to prohibit any other tenant on said property from selling grocery, meats, dairy, deli or bakery products and produce." *Id.* Wal-Mart began selling non-perishable food items using approximately forty feet of shelf space, but never sold milk, bread, fresh produce or cut meats. *Id.* The buyer for Wal-Mart's food department testified that 850 square feet of the 50,000 square feet of space was used for food items and approximately 4% of Wal-Mart's gross sales were from food sales. *Id.* at 373. The appellate court determined that Wal-Mart was prohibited from operating a supermarket based upon the lease terms but not from selling grocery items and determined that Wal-Mart was not a supermarket. *Id.*

In *Berkeley Development*, the Drug Fair used 1,200 to 2,000 square feet for food sales which represented 7-10% of the entire store space. *Berkeley Development Co. v. Great Atl. & Pac. Tea Co.*, 214 N.J. Super. 227, 234, 518 A.2d 790, 793 (Sup. Ct., Law Div., Union County 1986). The court determined that Drug Fair was a modern chain drug store and did not sell food to the extent of a supermarket. *Id*. at 214 N.J. at 241, 518 A.2d at 797.

Manyfoods believes that the comparison in dollars of annual sales is dispositive. Manyfoods contends that Wal-Mart admitted that it had food sales of $3 million alone since the store opening

20

in 2003. *See Manyfoods-Wal-Mart Opp.* at 11.  Manyfoods also states that Crowe, Wal-Mart's expert, failed to include the $2 million sales threshold in Food Marketing Institute's definition of supermarket. *Id.* at 11, n.5.  Although this may be the case, the Court recognizes Manyfoods' argument, but finds the applicable allocation of space and the percentage of gross sales to be more compelling and persuasive.

In the instant matter, food sales account for 9% of gross sales and the space allocated is a mere 3-4% of total space. Furthermore, Crowe, Wal-Mart's expert, submits that the space utilized in drug stores for food consumed off-premises is 23.1 and 26.6% as opposed to the 3-4% utilized by Wal-Mart.  This is persuasive as the lease definition of supermarket specifically excludes drug stores. *See Wal-Mart Mot.*, 13 n.3.  Finally, Wal-Mart does not have departmentalized food sections but rather limits food products to a few aisles including a refrigerated section.

C.     **Summary**

The Court finds the expert reports by Wal-Mart and Interstate to be persuasive for several reasons. However, at this juncture, these reports alone are not dispositive.  The Court has also considered the documentary evidence and finds it clear that Wal-Mart did not fall within the lease's definition of supermarket.  Specifically, the floor plan of the store clearly reflects that food products were merely incidental to the full product line available at Wal-Mart.  Moreover, the applicable sales figures do not indicate a materially adverse effect on Manyfoods.  Instead, they show that Wal-Mart's food sales were incidental to its total sales.  In addition, the increased competition in the area as evidenced by parallel declines in sales and revenue at both the Cedar Knolls and Wanaque stores is significant when determining loss of business.  All of this evidence in conjunction with the

21

experts' opinions and the relevant case law convinces the Court that under the facts herein,  Wal-Mart is not a supermarket as defined by the lease.

## III.    Manyfoods' Breach of Contract and Related Claims

### A.    Privity of Contract

In its opposition to both Interstate and Wal-Mart's summary judgment motions, Manyfoods belatedly argues that the agreement between it and Stop & Shop was actually an assignment and not a sublease.  Pursuant to the language of the Sublease, Stop & Shop is the Sublessor and Michas Brothers is the Sublessee. *See Wal-Mart Mot.,* Ex. B.  Thereafter, Michas Brothers assigned its interest in the Sublease to Manyfoods.  *See Manyfoods-Wal-Mart Opp.,* Ex. F.  It is clear from the language of the Sublease that the Sublessee had all of the Sublessor's benefits in and to the lease but no rights greater than those of the Sublessor.  *Id.*  The written modification of the Sublease dated February 12, 2001 provided that the Sublease and the Lease remain in full effect and indicated that the Sublessee has  all rights of assignment including the right to sublease, as provided in the Lease. *Id.* at Exs. E & F.

Manyfoods contends that where the whole term of the lease is transferred, then it is an assignment and not a sublease regardless of how it is termed in the agreement. *See Manyfoods-Interstate Opp.*, 8 (citing *Berkeley Dev.*, 214 N.J. Super. at 236).   However, at the time of the Debtor's asset sale to Oliva, the Asset Purchase Agreement included the following definition in the section describing transferred assets:

> (1.1)(a) The Lease and the Bank Lease.  Subject to Section 1.8, that certain sub-lease for the real property and improvements located at Ridgedale and Hanover Avenues, Cedar Knolls, New Jersey 07927, as more particularly described in Schedule 1.1(a) (the "Premises") as

> to which the Seller is the sub-lessee, together with the leasehold
> improvements (to the extent owned by the Seller) located at the
> Supermarket (the "Lease"), and that certain sub-lease of a portion of
> the Premises to the Bank (the "Bank Lease") as to which the Seller
> is the sub-lessor.

*Sale Order*, Ex. A, 3.  Schedule 1.1(a) defines the Lease being transferred as a Sublease.  *See id.* at

Schedule 1.1(a).  Thus, Manyfoods, which always previously acknowledged the document as a

sublease, is now estopped from advancing the argument that an assignment occurred when its own

sale documents clearly reference a Sublease.  The Court entered the Sale Order in January 2004, to

which was appended the Asset Purchase Agreement clearly referencing a Sublease.  The Sale Order

has been final for five years and the Court will not revisit or rewrite the Order.

Since the relationship between Stop & Shop and Manyfoods is that of sublessor and

sublessee, the Court finds that there is no privity of contract between the two.  Common law privity

of contract is the relationship between a landlord and a tenant, that is, the two parties who made the

contract initially.  *See Marino v. Mendez*, 243 N.J. Super. 342, 345 (Sup. Ct., Law Div., Hudson

County 1989).  All covenants between a landlord and a tenant are enforceable due to privity of

contract.  *Id.*  Similarly, there is privity of contract between a tenant and subtenant.  *Berkeley Dev.

Co. v. Great Atl. & Pac. Tea,* 214 N.J. Super. 227, 235 (Sup. Ct., Law Div., Union County 1986).

"It is well established that a subletting creates the relationship of landlord and tenant between the

[tenant] and the [subtenant]."  *Id.*  Furthermore, a subletting is a contractual agreement *solely*

between the tenant and the subtenant.  *Marino*, 243 N.J. Super. at 345.  However, there is no

contractual agreement between a landlord and a subtenant. *Id.* at 347.  Therefore, privity of contract

does not exist between a landlord and a subtenant, and hence covenants are not enforceable between

the two parties. *See Marino*, 243 N.J. Super. at 347; *see also In re Am. Int'l Airways, Inc.*, 44 B.R. 143, 147 (Bankr. E.D. Pa. 1984) (citation omitted).  Without privity of contract, Manyfoods cannot maintain a breach of contract claim against its landlord, Interstate.  Thus, the First Claim of the Complaint is hereby dismissed.

Absent a finding of breach of contract, the Fourth Claim for aiding and abetting brought against Wal-Mart must also be dismissed.  *See King's Choice Neckwear, Inc. v. Fedex Corp.*, 07-CV-0275 (DMC), 2007 WL 4554220, at *4 (D.N.J. Dec. 21, 2007) (citations omitted).  Aiding and abetting requires: (1) knowledge of another party's breach; (2) wrong-doing independent of the aiding and abetting; and (3) significant aid or participation from the aider or abettor.  *See id.*; *see also Morganroth & Morganroth v. Norris, McLaughlin & Marcus*, 331 F.3d 406, 415 (3d Cir. 2003).  Manyfoods argues that the alleged violation of the restrictive covenant by Interstate was significantly furthered by Wal-Mart's competing supermarket operation. However, without privity of contract, Manyfoods cannot enforce the restrictive covenant. Thus, it cannot succeed on its breach of contract claim against Interstate and therefore cannot also succeed on its aiding and abetting breach of contract claim against Wal-Mart.  Manyfoods further argues that Interstate acknowledges Wal-Mart's role in the alleged breach of contract by bringing a cross-claim for indemnification. However, it is crystal clear in the cross-claim that Interstate's motivation for bringing the claim is to preserve its indemnification rights in the event that a court makes a determination that breach of contract occurred, not to admit any type of liability or to suggest that Wal-Mart had any knowledge or intention.  *See Def. Interstate Realty Co.'s Answer, Affirmative Defenses, and Cross-Claim*

24

*against Walmart Stores, Inc. ("Interstate Answer")*, ¶ 9.  This is common practice when pleading

in the alternative.  Thus, the Fourth Claim is dismissed.

### B.    Restrictive Covenants

Without threshold findings that Wal-Mart is a supermarket or that Manyfoods is in privity

of contract, Manyfoods cannot sustain its allegation that the restrictive covenant has been breached.

Restrictive covenants, such as the one in the instant matter prohibiting the operation of another

supermarket in the same shopping center, run with the land.  *See Davidson Bros., Inc. v. D. Katz &*

*Sons, Inc.*, 121 N.J. 196, 210, 579 A.2d 288, 295 (1990) (non-competition clauses run with the land).

Moreover, "strict construction is applied to restrictive covenants, unless such a rule would defeat

the obvious purpose of the covenant.  Insofar as covenants tend to curtail or hinder the full use of

the land, the public policy in favor of alienability of land comes in to urge strict construction."

*Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Twp.*, 31 F. Supp. 2d 389, 398 (D.N.J.

1998) (citations omitted).   As with traditional contract interpretation principles, the terms of a

restrictive covenant are given their ordinary meaning.  *See id.* (citing *James v. Federal Ins. Co.*, 5

N.J. 21, 24, 73 A.2d 720 (1950)); *see also Berkeley Development Co. v. Great Atl. & Pac. Tea Co.*,

214 N.J. Super. 227, 240, 518 A.2d 790, 797 (Sup. Ct., Law Div., Union County, 1986).  Thus, the

First Claim alleging breach of the restrictive covenant is dismissed.

### C.    Third-Party Beneficiary Doctrine

Manyfoods did not allege the third-party beneficiary doctrine at the time it filed the instant

adversary complaint, and instead makes the argument in response to Interstate's summary judgment.

While this claim may be time-barred as Interstate argues, the Court will still address it.  "Third-party

25

beneficiaries may sue upon a contract made for their benefit without privity of contract." *Rieder Communities, Inc. v. Township of N. Brunswick*, 227 N.J. Super. 214, 221, 546 A.2d 563, 566 (App. Div. 1988). To determine whether a party has standing as a third-party beneficiary, the intent of the parties at the time of contract signing governs. *Consult Urban Renewal Development Corp. v. T.R. Arnold & Assoc., Inc.*, 06-1684 (WJM), 2009 U.S. Dist. LEXIS 56194, *5-6 (D.N.J. July 1, 2009) (citing *Broadway Maintenance Corp. v. Rutgers*, 90 N.J. 253, 259-60, 447 A.2d 906 (1982))**.** Without this intent, "the party is merely an incidental third-party beneficiary with no contractual standing" or enforceable rights. *Id.* at *6 (citation omitted); *see also Rieder Communities*, 227 N.J. Super. at 222, 546 A.2d at 567 (citing *Gold Mills, Inc. v. Orbit Processing Corp.*, 121 N.J. Super. 370, 373 (Law Div. 1972)).

The Court is persuaded by Interstate's argument that Manyfoods was not a consideration when Interstate and Stop & Shop entered into the Lease. Manyfoods is clearly not an intended beneficiary in the sense that the restrictive covenant was included in the Lease for its behalf, nor, is Manyfoods an intended beneficiary of the Wal-Mart Lease. Moreover, Manyfoods pursuit of this action on third-party beneficiary grounds is in complete contravention of the clear rule that there is no privity of contract between landlords and subtenants. Allowing Manyfoods to go forward with this claim obviates the law on privities between landlords and subtenants which insulates landlords. *See Berkeley Development Corp.*, 214 N.J. Super. at 235-36 (citations omitted).

Manyfoods relies upon *Paper Store of Shrewsbury v. White City Shopping Center* and *Iggy's Doughboys, Inc. v. Giroux* for its contention that it is a third-party beneficiary to the Lease and Wal-Mart Lease.  In *Paper Store of Shrewsbury*, the lease between Paper Store and the landlord

26

contained a provision whereby the landlord would not allow for the lease of space to a card and gift store as defined in the lease. *Paper Store of Shrewsbury v. White City Shopping Ctr.*, 2003-4828, 2003 Mass. Super. LEXIS 443, *1 (Sup. Ct. Mass., Middlesex Dec. 10, 2003). Thereafter, when Paper Store learned of lease negotiations between the landlord and Dollar Forever, All of the parties signed a letter acknowledging and referencing the covenant in the lease between the landlord and Paper Store. *Id.* at *2. Considering this factual scenario, the Massachusetts court found that Paper Store was indeed a third-party beneficiary particularly due to the signed letter since that provided reassurance to Paper Store not to enforce the covenant in its lease. *Id.* at *4-5.

In *Iggy's Doughboys*, the Rhode Island court enforced a restrictive covenant where the tenant entered into a lease extension based upon the confirmation of the landlord that the neighboring tenant would not operate a take-out window food service. *Iggy's Doughboys, Inc. v. Giroux*, 729 A.2d 701, 706 (R.I. 1999). The Rhode Island court also reasoned that it would not obviate the meaning of the covenant for semantics since the neighboring tenant argued that there was no "window" but instead a counter. *Id.* at 705-06.

In comparison to both cases, Manyfoods is a subtenant to the Lease, not a tenant like Paper Store or Iggy's Doughboys who were both parties with which the landlord entered into leases. It is clear that neither Manyfoods nor Stop & Shop agreed via letter that the restrictive covenant would not be violated as was the case in *Paper Store*. Neither Manyfoods nor Stop & Shop entered into a lease extension such as Iggy's Doughboys.

## IV.    Tortious Interference with Contract

"Tortious interference developed under common law to protect parties to an existing or prospective contractual relationship from outside interference."    *East Penn Sanitation, Inc. v. Grinnell Haulers, Inc.*, 294 N.J. Super. 158, 169 (App. Div. 1996) (citing *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J 739, 752, 563 A.2d 31 (1989)).    To maintain a tortious interference with contract claim, the plaintiff must demonstrate:

> (1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage.

*Russo v. Nagel*, 358 N.J. Super 254, 268, 817 A.2d 426, 434 (App. Div. 2003).[3]    Malice is when a person "intentionally commits a wrongful act without a justification." *Ross v. Celtron Int'l, Inc.*, 494 F. Supp. 2d 288, 305 (D.N.J. 2007) (citation omitted).    Malice is a flexible standard taking into consideration the factual context.    *See Lamorte Burns & Co., Inc. v. Walters*, 167 N.J. 285, 306 (2001).    "[T]he relevant inquiry is whether the conduct was sanctioned by the 'rules of the game,' for where a plaintiff's loss of business is merely the incident of healthy competition, there is no compensable tort injury.    The conduct must be both 'injurious and transgressive of generally accepted standards of common morality or of law." *Id.* at 306-07 (citations omitted).    "The fact that

---

[3]Another recitation of the elements required for tortious interference with contractual relations is: (1) intentional or malicious interference with a prospective or existing economic or contractual relationship with a third party; (2) that the interference caused a loss of prospective gain; and (3) damages. *Ross v. Celtron Int'l, Inc.*, 494 F. Supp. 2d 288, 305 (D.N.J. 2007) (citing *Angrisani v. Capital Access Network, Inc.*, 175 Fed. Appx. 554, 556 (3d Cir. 2006); *Cox v. Simon*, 278 N.J. Super. 419, 651 A.2d 476, 483 (App. Div. 1995)). In a recent unreported decision, the District Court uses this definition for tortious interference with prospective economic advantage.    *See Interstate Realty Co., Inc. v. Sears, Roebuck & Co.*, 06-5997 (DRD), 2009 U.S. Dist. LEXIS 35141, *24 (D.N.J. Apr. 27, 2009)*.    The Court finds: "The difference between a claim for tortious interference with contractual rights and tortious interference with prospective economic advantage is that a claim for the former involves an actual contract whereas a claim for the latter involves a prospective contract or other economic benefit." *Id.* at *31-32.

a breaching party acted to advance its own interests and financial position does not establish the necessary malice or wrongful conduct." *Russo*, 358 N.J. Super. at 268 (citing *Sandler v. Lawn-A-Mat Chem. & Equip. Corp.*, 141 N.J. Super. 437, 451-52, 358 A.2d 805 (App. Div.) *cert denied*, 71 N.J. 503 (1976)).

Manyfoods' allegations of tortious interference with contract are directed at both Wal-Mart and Interstate. With respect to Wal-Mart, Manyfoods argues that Wal-Mart had notice of the restrictive covenant in the Lease and in fact inquired about it during the planning stages, but then continued to violate the restrictive covenant for profit motives. *See Manyfood-Walmart Opp.*, 22-23. This argument cannot stand as the Court has determined that Wal-Mart is not a supermarket in violation of the Lease.  Without being a supermarket, Wal-Mart has not violated the restrictive covenant, thus Wal-Mart is not a breaching party.  The Court therefore dismisses the Third Claim of the Complaint.

As for Interstate, Manyfoods argues that including the restrictive covenant in Wal-Mart's lease was insufficient and that Interstate needed to actively protect Manyfoods' interests by enforcing the restrictive covenant. *See Manyfoods-Interstate Opp.*, 22. For the first time, Manyfoods then attempts to contend that Wal-Mart could also fall within the phrase "convenience or compact type grocery store" as included in the definition of supermarket under the Lease. *See id.* at 24. It is quite clear that Interstate did not intentionally commit a wrongful act. To the contrary, Interstate incorporated the restrictive covenant at issue in the Wal-Mart Lease and required Wal-Mart to enforce it. Furthermore, Manyfoods is a party to the Sublease and thus Interstate needed to have tortiously interfered with the Sublease for this claim to stand, which it did not. Instead, Interstate

specifically required compliance with the covenant by Wal-Mart which served as protection of Manyfoods' rights.  Finally, as stated previously, Wal-Mart is not a supermarket as defined by the Lease thus Interstate could not have caused any damage to Manyfoods by leasing space to Wal-Mart.  Thus, the Second Claim of the Complaint is hereby dismissed.

## V.     Unfair Competition

Unfair competition in New Jersey is "an amorphous area of jurisprudence."  *Restaurant Technologies, Inc. v. Allora*, 06-5202 (MLC), 2008 U.S. Dist. LEXIS 62405, *7-8 (D.N.J. Aug. 15, 2008).  "The essence of unfair competition is fair play," and the purpose is "to promote higher ethical standards in the business world."  *Ryan v. Carmona Bolen Home for Funerals*, 341 N.J. Super. 87, 92, 775 A.2d 92, 94-95 (App. Div. 2001); *see Am. Shops, Inc. v. Am. Fashion Shops of Journal Sq., Inc.*, 13 N.J. Super. 416, 420, 80 A.2d 575, 576 (App. Div. 1951) ("The law will not permit the trespasser to take the crop away from the sower.")  Thus, this is an area of law that is flexible as "the evolving standards of commercial morality demand."  *Id.* All acts constituting unfair competition have not been categorized.  *See N.J. Optometric Assoc. v. Hillman-Kohan Eyeglasses, Inc.*, 144 N.J. Super. 411, 365 A.2d 956 (Super. Ct., Chancery Div. 1976); *Am. Shops, Inc.,* 13 N.J. Super. at 421.

Apparently, Manyfoods' unfair competition claim is rooted in its position that Wal-Mart not only violated the restrictive covenant but also engaged in predatory pricing. *See Manyfoods-Wal-Mart Opp.*, 27.  In support of this claim, Manyfoods singularly cites to the deposition testimony of former store manager Adam Shapiro who testified that Wal-Mart employees entered Manyfoods and scanned price tags of products leading to a lowering of price by Wal-Mart. *See Manyfoods-Walmart*

*Opp.*, Ex. W at 105:21-106:4.  However, earlier in his deposition, Shapiro also testified that he went

to Wal-Mart to observe the prices charged for products after hearing that Wal-Mart was charging

less than Manyfoods and after learning that Wal-Mart employees were doing the same. *See id.* at

97:2-101:9.  Taking this as fact, Manyfoods engaged in the same conduct that it alleges as unfair

competition against Wal-Mart. Shapiro also stated very clearly that Manyfoods could not compete

with Wal-Mart on pricing.  *See id.* at 97:18-98:2; 106:8-21.

"[P]laintiff has no right to be protected against competition, but only to be free from

malicious and wanton interference, disturbance or an annoyance." *Gold Fuel Service, Inc. v. Esso

Standard Oil Co.*, 59 N.J. Super. 6, 13, 157 A.2d 30, 33 (Super. Ct. Chancery Div. 1959).

Manyfoods must demonstrate that the conduct alleged here was malicious, unfair, or unlawful.  This

burden has not been met. "A competitor has an absolute right to take away as much of the other

fellow's business as he can lawfully. . . Everyone has a right to enjoy the fruits and advantages of

his own enterprise, industry, skill and credit." *C.R. Bard, Inc. v. Wordtronics Corp.*, 235 N.J. Super.

168, 173, 561 A.2d 694, 697 (Super. Ct. Law Div., Union County 1989).  Understanding and

knowing the price of a neighboring store is common retail practice and, moreover, both Manyfoods

and Wal-Mart appear to have engaged in such conduct. There is no malicious or unlawful conduct

here. Thus, the Fifth Claim against Wal-Mart is hereby dismissed.

## VI.    Unjust Enrichment

Unjust enrichment requires a plaintiff to show that a defendant received a benefit and

retained it without payment.  *Iliadis v. Wal-Mart Stores, Inc.*, 191 N.J. 88, 111 (2007) (citing *VRG

Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554, 641 A.2d 519 (1994)).  "That quasi-contract doctrine

also requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *Id.* (citation omitted).

Here, Manyfoods makes an unjust enrichment claim against Interstate and Wal-Mart. With respect to Interstate, Manyfoods argues that the rent paid by Manyfoods to Interstate was not adjusted downward upon the alleged violation of the restrictive covenant by Wal-Mart. *See Manyfoods-Interstate Opp.*, 25.  In addition, Manyfoods contends that it provided Interstate with an anchor for its shopping center by serving as its supermarket but lost its benefit of the exclusive right to do so when Wal-Mart began operations.  *Id*. These allegations, according to Manyfoods, satisfy the *prima facie* claim for unjust enrichment.

As to the allegation against Wal-Mart, Manyfoods suggests that its consent was necessary before Wal-Mart could lease space in the Shopping Center and the benefit conferred was Wal-Mart's opening without this consent. This, Manyfoods argues establishes a *prima facie* claim for unjust enrichment.

The arguments made by Manyfoods are without merit. The facts, as alleged here, do not demonstrate a benefit conferred to Wal-Mart or Interstate by Manyfoods. In addition, there has been no violation of the restrictive covenant; thus, Manyfoods still had the benefit of its protection in the lease. Therefore, the Sixth Claim is hereby dismissed.

### Conclusion

For the foregoing reasons, Interstate and Wal-Mart's motions for summary judgment are each  hereby granted as no triable issues of material fact exist. The adversary complaint is hereby dismissed.

An Order in conformance with this Opinion has been entered and a copy is attached hereto.


/s/   *Donald H. Steckroth*

_____
DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated: August 17, 2009